Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 564 | DATE | 6/2/2004 |
| CASE TITLE | Capital City Finance Group vs. County of Cook | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the Court's memorandum opinion and order, judgment is entered in favor of the defendant and against plaintiff. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | JUN 3 - 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | 105 |
| | Copy to judge/magistrate judge. | | | |
| MF | courtroom deputy's initials | 2004 JUN -2 PM 3:22 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DOCKETED
JUN 3 - 2004

| | |
|---|---|
| CAPITAL CITY FINANCIAL GROUP, an Indiana corporation, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF COOK, an Illinois corporation, <br><br> Defendant. | Case No. 01 C 564 <br><br> Honorable John W. Darrah |

JUN 3 - 2004

## OPINION AND ORDER

Plaintiff, Capital City Financial Group, Inc., filed a three-count Complaint against Defendant, the County of Cook. The Court granted Defendant's Motion for Summary Judgment as to counts alleging a breach of contract and account stated. Trial on the remaining count, alleging fraudulent misrepresentation, was by the Court without a jury.

The Court has considered the evidence, including the testimony of witnesses, exhibits, stipulations, the written arguments of counsel for the parties and the authority cited therein.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all admissible evidence as well as the Court's determination of the credibility of the witnesses. To the extent that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

/05

## **FINDINGS OF FACT**

Plaintiff is an Indiana corporation, having its principal place of business in Indianapolis, Indiana. Plaintiff is a financing/funding company that provides financial services to various entities, including the "factoring" of such entities' accounts receivable. William Brooks is the general manager of Plaintiff, and he runs the business and is the person most knowledgeable about the corporation. The corporation had seven employees.

Defendant is a body politic and corporation created under 55 ILCS 5/5-1001. At all times pertinent to this dispute, Defendant owned and operated Provident Hospital of Cook County. Provident is a small to medium sized hospital with 119 beds. The hospital is located at 500 East 51st Street in Chicago, Illinois. Provident provides medical facilities, personnel, and services to the general public for the care and treatment of physical and mental diseases.

During the relevant period, Earl Bell was Provident's Associate Administrator of Finance, a position that is the functional equivalent of a Chief Financial Officer. Bell's responsibilities at Provident included the day-to-day supervision of Provident's financial operations. Bell reported directly to Provident's Chief Operating Officer.

As Associate Administrator, Bell was responsible for the development, interpretation, coordination, and administration of the organization's policies on finance, accounting, budget, data processing, patient accounting, medical records, internal controls, and auditing. Bell was also responsible for the maintenance of records and procedures required to adequately safeguard the assets of Provident. Bell planned, organized, coordinated, and controlled the financial policies of Provident and controlled receipt of revenue, expenditure of funds, and conservation of Provident's assets. He reviewed, interpreted, analyzed, and communicated financial reports and

2

data to management and Provident's board of trustees. As Associate Administrator, Bell, along with the Chief Operating Officer, had to ensure proper review and coordination of all contracta which directly affected Provident's interests.

Third-party Defendant Mary A. Payne was the President of Swerbeh, Ltd. Around August 2000, Payne later acquired third-party Defendant JTD, Inc., which carried on the same business as Swerbeh. JTD is a temporary staffing agency which supplied goods and services to companies and hospitals. Plaintiff provided Payne with funding to purchase JTD.

Defendant's purchasing ordinance in effect at all times relevant to this matter provides, in pertinent part, that:

> The Board of Commissioners of Cook County shall have no power or authority to delegate to any committee or other person or persons the "power to act", when such "power to act" shall involve the letting of any contract or the expenditure of public money exceeding the sum of $10,000.00; and any action of said board, or of any committee thereof, or of any other person or persons shall be null and void. No money shall be appropriated or ordered paid by said County Commissioners beyond the sum of $10,000.00, unless such appropriation shall have been authorized by a vote of at least two-thirds of the members elected to the said county board. And no officer of Cook County, or other person shall incur any indebtedness on behalf of the county, unless first authorized by said Board of Commissioners.

Cook Co. Contr. & Purch. Ord., ch. 10, sec. 17. Thus, in order to secure services for an amount exceeding $10,000.00, Provident Hospital would have to ask the County Board for authority prior to entering into a contract. Once the County Board authorized Provident to secure services pursuant to a contract, the contract would have to go back to the County Board a second time for execution by the County's President, Purchasing Agent, and Comptroller. County Board approval is a matter of public record and is published on the fifth floor of the County building. County Board agendas and minutes are a matter of public record.

No one at Provident, including Bell, had authority to authorize any payment over $250.00 to any vendor. All obligations relating to Provident in the year 2000 in excess of $250.00 required a County purchase order number.

The head of a department, such as Bell, can institute the process of seeking County Board approval by writing a letter to the County Board asking the matter be placed on the Board meeting agenda. After the County Board has given authorization, the County Purchasing Agent advertises for bids. Then a County department, such as Provident, recommends the acceptance of a particular bid to the County Board. The Board then decides whether to approve the bid for contract and thereby create a County obligation.

All County obligations in excess of $250.00 must have a purchase order number and a County 29A voucher form, which is the official vehicle to effectuate payment. Vendors billing the County must fill out the 29A voucher form referencing the purchase order number and may attach their own invoice forms to the County voucher form. Vendors then send the 29A voucher form to the County Comptroller's Office for payment.

The Comptroller's Office checks the purchase order number on the 29A voucher form and checks whether the payment is for over or under $10,000.00 to determine if there are sufficient funds assigned to that purchase order number to make payment. If funds are not available, no payment is made.

Bell's authority regarding approval of payment for goods or services for Provident was limited to department approval for further review by the Comptroller's Office. The largest amount of money to which Bell could bind the County in 2000 without County Board approval was $250.00. Bell, though, was an authorized signer of County 29A voucher forms. His

4

signature on a 29A voucher form indicated departmental approval. After the County Board approved a contract that involved Provident, Bell also had the authority to represent to others that the County Board had in fact approved such a payment.

Plaintiff is engaged in the business of factoring. Factoring is an unregulated business that involves the purchase of receivables from companies at a discounted value. The entity from which the account receivable is purchased is referred to as the "client." The entity which owes the money reflected in the account receivable is the customer of the client and is referred to as the "account debtor."

The purchase of accounts receivable is a multi-step process; and Plaintiff performs a customary practice and procedure before entering into a factoring transaction. First, the client prepares a client application that is followed by a client information sheet, which allows Plaintiff to obtain credit reports regarding the client. Plaintiff also requires the completion of a client interview sheet and requests certain basic information such as balance sheets, profit and loss statements, tax returns, personal financial statements, and samples of the client's invoices. Plaintiff then runs credit searches on the client, the account debtor, and obtains the personal credit record of the principals of the client, through online systems, such as Dun and Bradstreet and Lexis/Nexis. Plaintiff also requires that the client sign an Accounts Receivable Purchase and Security Agreement, which assigns the client's accounts receivable to Plaintiff.

Plaintiff checks a Dun and Bradstreet report for each account debtor to determine if the company exists and checks the financial strength of each account debtor. This is important because the account debtor is ultimately the entity that is responsible for payment.

After Plaintiff completes this due diligence procedure, Plaintiff notifies the account debtor of the assignment of the client's account. A notification form is sent by the client to the account debtor, using a document provided to the client by Plaintiff. Typically, the notification form is sent to the person at the account debtor who is responsible or knowledgeable enough to enforce the factoring agreement. By signing the notification form, the account debtor acknowledges the assignment of the accounts receivable to Plaintiff. Once Plaintiff receives the notification form, its practice is to contact the person who signed the notification to determine which person on behalf of the account debtor will verify that the work has been performed and the invoices are due and payable.

Plaintiff creates a document, "Schedule A," each time it buys a set of invoices. Attached to each Schedule A is a document called "Purchases and Advances," which sets forth amounts involved in the factoring transaction. Schedule A, which contains the client's signature and concurrence that the matters attached thereto represent what Plaintiff is buying, constitutes a separate contract with its client each time Plaintiff purchases a particular invoice from a client. Plaintiff obtains verification from the account debtor and considers the verification signature protection that the invoice will be paid.

In the typical situation, Plaintiff makes an initial payment to the client for the purchase of the account receivable, based on a discounted amount of the invoice, and designates the remainder as reserves. Once the account debtor pays the invoice, by sending Plaintiff the full payment, Plaintiff returns a portion of the reserves to the client based upon how quickly the account debtor pays and the graduated percentages as set out on a Schedule B to the Accounts

Receivable Purchase and Security Agreement. Generally, Plaintiff retains one to five percent of this margin.

On October 6, 1997, Plaintiff entered into an Accounts Receivable Purchase and Security Agreement with Swerbeh. Brooks signed the Agreement on behalf of Plaintiff; and "Mary Hackney Payne," as Treasurer, and Anthony Payne, as President, signed on behalf of Swerbeh. Payne provided Plaintiff with an Application to Enter into a Purchase and Security Agreement with Plaintiff. This agreement was dated October 2, 1997; and she listed her social security number as 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.

In March through June 1998, Plaintiff was involved in factoring transactions dealing with Provident's medical records department on behalf of Swerbeh; whereby, Plaintiff followed its invoice verification process with Provident for Swerbeh invoices.

Plaintiff required that Provident employees check Plaintiff's time sheets with Provident's records to check that the Swerbeh employees actually worked. These verification forms were signed by Provident employees other than Bell because, usually, Plaintiff did not deal with CFOs.

In five of Plaintiff and Swerbeh's factored transactions with Provident, a Provident employee signed Plaintiff's invoice verification forms that provided the names, hours, and amounts approved for payment to persons that provided services to Provident. Work that Swerbeh performed at Provident in 1998 was invoiced either every week or every other week, and no more than eight Swerbeh employees were ever listed on any of Plaintiff's invoice verification forms.

Bell was the person at Provident who signed a May 20, 1998 Cook County 29A voucher form indicating department approval for payment to "Swerbeh, Ltd. c/o Capital City Financial Group." This voucher was the first time Plaintiff had ever seen Bell's signature.

A signed invoice verification was not enough to receive payment from Defendant; a Cook County purchase order number, a 29A voucher form, and a contract number were all required to obtain payment from Defendant. Cook County purchase order number 840336 was assigned for the purchase of Swerbeh services provided to Provident. The 29A voucher form with Bell's signature contained this purchase order number. Thus, when Swerbeh work was verified at Provident in 1998, the work had been authorized, as evidenced by the presence of the purchase order number. Thereafter, Defendant issued a check for the amount approved on the 29A voucher, $9,000.00.

In 1998, the Comptroller's Office issued Cook County checks for payments to Swerbeh for ten individual obligations, each under $10,000.00; and mailed payments for those obligations to Plaintiff. Moreover, Plaintiff's factoring of Swerbeh invoices for services to any hospital, including Provident, never exceeded $10,000.00. It took Defendant County of Cook approximately sixty to eighty days to pay Plaintiff for factored Swerbeh accounts in 1998. Plaintiff has never been paid with a check that was issued by Provident.

On August 4, 1999, the Cook County Board of Commissioners awarded Contract No. 99-54-647 to JTD for temporary clerical support services for Provident. JTD and Plaintiff did not enter into any accounts receivable purchase agreements for this contract.

On August 15, 2000, Payne, on behalf of JTD, applied to Plaintiff for funding. Although Plaintiff had done business with JTD before, Plaintiff required Payne to complete another

8

application form because JTD had changed ownership. Payne signed a Personal Financial Statement on August 15, 2000, listing her social security number as 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. Later, on September 11, 2000, Payne signed a Personal Guaranty.

In August 2000, Plaintiff was told that JTD had a contract to provide services at Provident. However, there was no contract between JTD and Provident other than the 1999 JTD contract.

On August 28, 2000, Payne sent a facsimile letter to Bell at Provident informing Bell that JTD had entered into an arrangement with Plaintiff whereby JTD's accounts receivable were to be assigned and processed through Plaintiff. Bell's signature appears on that letter, which indicates the letter was faxed from Provident on September 1, 2000. Payne also indicated to Plaintiff that Bell was the contact person at Provident.

Consistent with Plaintiff's practice and procedure, one of Plaintiff's employees, Oretha Thompkins, talked with the designated contact person, Bell. Bell told Thompkins that he was going to be the person who would perform the invoice verifications. Although Plaintiff did not usually deal with a high source, such as a CFO, Payne had told Brooks that Bell was helpful in expediting payments in the past and that Bell would be helpful in making sure Plaintiff was paid for this particular contract.

However, in August and September 2000, Plaintiff did not request a copy of the alleged contract between JTD and Defendant for the services reflected in JTD Invoice Nos. 32-018 and 32-019; nor did Plaintiff know any contract terms between JTD and Defendant. Plaintiff also failed to contact Defendant's Purchasing Agent or the Defendant's Comptroller in August and September 2000; nor did Plaintiff check any public records to determine whether the County

9

Board had approved a contract for the services on JTD's project at Provident. Nowhere in the Agenda or Post-Board Action Agenda for the year 2000 Cook County Board meetings is there any indication that the County Board approved payment of JTD Invoices 32-018 or 32-019. Nowhere in the minutes for the County Board meetings held between July 1, 2000 and December 1, 2000, is there any mention of any payment whatsoever approved for Capital City Financial Group of JTD with respect to any goods or services.

On or around August 30, 2000, JTD and Payne sent Plaintiff a complete Schedule A that included Invoice No. 32-018, prepared by JTD, together with backup materials for Invoice No. 32-018 that indicated JTD supplied Provident with employees. These backup materials showed the employees by name and hours worked during the weeks ending August 6, 2000 to August 27, 2000, and were prepared by JTD. These backup materials also showed that JTD supplied Provident with approximately 66 workers per week, who worked an aggregate total of 2,190 to 2,298 hours per week.

When Plaintiff received these backup materials, it added up the employee hours on the backup materials to ensure the totals matched the week-ending totals on the invoice. Plaintiff then used the information on JTD's invoice to prepare the invoice verification document. On or about September 1, 2000, Plaintiff faxed to Bell an invoice verification form for Invoice No. 32-018 that purports to represent services provided by JTD at Provident during the weeks ending August 6, 2000 to August 27, 2000, for a total amount of $173,256.20. This invoice verification form states, "The following invoices from JTD, Inc. are approved for payment without offsets, discounts, defense, counterclaims, or abatements."

Under certain extreme circumstances, the County Board Commissioners can be polled to vote on matters between County Board meetings. Under those circumstances, the polled matters are reflected on the agenda and in the minutes of the following meeting. The first time the County Board met after the date of August 30, 2000 for JTD Invoice No. 32-018 was September 7, 2000. The County Board agenda and minutes for the September 7, 2000 meeting reflect no polling of the County Board Commissioners for approval of payment of JTD Invoice No. 32-018.

Also on September 1, 2000, Plaintiff obtained a Dun and Bradstreet report on Provident, the account debtor. This report indicated that Cook County paid Provident's bills, and it paid Provident's bills between 30 and 120 days.

On or about September 5, 2000, Plaintiff received a copy of Plaintiff's invoice verification form No. 32-018 signed by Bell. The total amount due on this invoice and the total amounts of accounts receivable purchased by Plaintiff for this invoice was $173,256.20. Plaintiff advanced to JTD $121,279.34, based on a 70% factor rate applied to the invoice amount. Of this amount, $34,651.24 was deducted by Plaintiff at Payne's direction and applied to preexisting debt from Swerbeh on behalf of JTD. Plaintiff then wire-transferred to Swerbeh, on behalf of JTD, the remaining $86,608.10. The information on Invoice No. 32-018 was fictitious.

On September 18, 2000, Plaintiff obtained a Dun and Bradstreet report on Payne. The social security number Plaintiff used to obtain this report was 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. This number was the same social security number Payne provided on her 1997 Swerbeh application with Plaintiff, not the social security number Payne used on her 2000 JTD personal financial statement provided to Plaintiff. Payne also signed the relevant forms with the name Mary A. Payne, not Mary

Hackney Payne as she signed on the October 1997 Accounts Receivable Purchase and Security Agreement with Swerbeh entered into with Plaintiff.

On October 12, 2000, JTD and Payne sent Plaintiff a completed "Schedule A" that included Invoice No. 32-019 prepared by JTD, together with backup materials for Invoice No. 32-019 indicating that JTD supplied Provident with employees. These backup materials showed the employees by name and hours worked during the weeks ending September 3 to October 1, 2000, and were prepared by JTD. These backup materials also claimed that JTD supplied Provident with approximately 74 workers per week, who worked an aggregate total of 2,791 to 2,874 hours per week.

When Plaintiff received these backup materials, Plaintiff prepared the invoice verification document. On October 12, 2000, Plaintiff faxed to Bell at Provident the invoice verification form for Invoice No. 32-019.

On October 12, 2000, Plaintiff received a signed invoice verification for Invoice No. 32-019, dated October 12, 2000, signed by Bell. The total amount due on Invoice No. 32-019 and the amount of accounts receivable purchased by Plaintiff was $260,287.50. Plaintiff advanced to JTD $182,201.25, based on a 70% factor rate applied to the invoice amount. At Payne's direction, $52,057.50 was deducted by Plaintiff and applied to a preexisting debt owed by Swerbeh to Plaintiff.

On October 12, 2000, Denise Brooks then forwarded Plaintiff's October 12, 2000 invoice verification form for Invoice No. 32-019 with Bell's signature to Plaintiff's general manager, William Brooks. After receiving Plaintiff's invoice verification form for Invoice No. 32-019, Plaintiff issued its check number 4914 to "Swerbeh/JTD" for $130,143.75 and sent the check to

the attention of Mary A. Payne on October 13, 2000. Plaintiff funded the initial payment to JTD for the 32-019 invoice through a re-factoring agreement with Capital Resource Funding, after Plaintiff sent Capital Resource Funding information and attachments in a September 13, 2000 letter.

The first time the County Board met after the date of October 6, 2000 for JTD Invoice No. 32-019 was October 17, 2000. The County Board agenda and minutes for the October 17, 2000 meeting reflect no polling of the County Board of Commissioners for approval of payment on JTD Invoice No. 32-019.

JTD's representation in Invoice Nos. 32-018 and 32-019 were false. There was no contract between Defendant and either JTD or Plaintiff for those services, and no County purchase order number was assigned for the services represented in JTD Invoice Nos. 32-018 and 32-019. JTD did not provide services at Provident between July 31, 2000 and October 6, 2000, as claimed in Invoice Nos. 32-018 and 32-019. The individuals listed whose names appear on the backup materials for Invoice Nos. 32-018 and 32-019 did not work at Provident during the relevant period. The large number of employees listed on the backup materials could not have been physically accommodated at Provident because of the facility's size.

Plaintiff did not provide Bell with the backup materials nor confirmed with Bell whether he had received the backup materials from JTD for those invoices. The invoice verification forms for Invoice Nos. 32-018 and 32-019 also did not, on their face, require verification that individual employees worked a certain number of hours. Unlike some prior invoice verification forms, these invoice verification forms only listed the total amounts Plaintiff was owed and did not individually list each employee that worked during a specific time frame.

13

Plaintiff further failed to determine whether there were any County purchase order numbers assigned to JTD Invoice Nos. 32-018 and 32-019, nor did a purchase order appear on these invoices. Nor was a County 29 A voucher form for Invoice Nos. 32-018 and 32-019 ever seen by Plaintiff. There were no contracts between Defendant and JTD for services during the year 2000.

Defendant's Comptroller's Office refused to make payments on Invoices 32-018 and 32-019. The total face value of JTD Invoice Nos. 32-018 and 32-019 is $433,543.70. In total, Plaintiff actually paid JTD $303,480.59, with $87,708.75 of this amount applied to a preexisting debt JTD and Swerbeh owed Plaintiff.

On November 8, 2000, invoice verification form No. 32-020 in the amount of $287,383.00 for purported JTD services provided to Provident from October 2 to November 6, 2000, signed by Bell was faxed to Plaintiff. Plaintiff did not advance any funds on this invoice.

A Dun and Bradstreet report on JTD, obtained by Plaintiff on December 13, 2000, indicated that JTD had a federal tax lien of $53,533.00 as of February 2, 2000.

## CONCLUSIONS OF LAW

The issue is whether Defendant is liable for misrepresentations to Plaintiff based on the conduct of Earl Bell, the former Chief Financial Officer of Provident Hospital, which is owned and operated by Defendant.

To prove a claim for fraudulent misrepresentation under Illinois law, Plaintiff must establish that: (1) Defendant made a statement; (2) the statement in question was of a material nature; (3) the statement in question was untrue; (4) Plaintiff relied upon the statement in

14

question to its detriment; (5) the statement in question was made for the purpose of inducing reliance; and (6) the statement in question was known by the person to be untrue or was made in culpable ignorance of its truth or falsity. *Bensdorf & Johnson, Inc. v. N. Telecom Ltd.*, 58 F. Supp. 2d 874, 881 (N.D. Ill. 1999) (citing *Doherty v. Kahn*, 682 N.E.2d 163, 167 (Ill. App. Ct. 1997)). Plaintiff's reliance on Bell's statements must also be justified; "*i.e.*, [it] must have had a right to rely." *Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601 (1980) (*Soules*).

"Justifiable reliance must be shown by clear and convincing evidence." *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir. 1988) (citing *Nat'l Republic Bank v. Nat'l Homes Constr. Corp.*, 381 N.E.2d 15, 21 (1978)). In determining whether Plaintiff's reliance was justifiable, the representation in question must be viewed in light of all the facts which Plaintiff had actual knowledge, as well as those facts it might have discovered through the exercise of ordinary diligence. *Soules*, 402 N.E.2d at 601 (citing *Schmidt v. Landfield*, 20 Ill. 2d 89, 94 (1960)).

The Cook County Purchasing Ordinance at issue in this case prohibits a finding of justifiable reliance based solely on representations made by a person unauthorized to commit Cook County financially for services or goods that exceed $10,000.00, unless the County Board of Commissioners first authorizes that transaction. *See D.S.A. Finance Corp. v. County of Cook*, 801 N.E.2d 1075, 1081-83 (2003) (*DSA Finance*).

## **DECISION**

Plaintiff could not justifiably rely on Bell's authority to bind the County to the purported contracts; such authority clearly does not exist because the language of the County Purchasing Ordinance expressly negated such authority and specifically requires approval by Defendant's County Board. Rather, the issue is whether Plaintiff justifiably relied on Bell's representations that Defendant's County Board had actually approved the purported contracts between Provident and JTD. Plaintiff argues in the affirmative and points to: (1) Bell's position and duties as CFO at Provident; (2) Bell's signature on the invoice verification forms for Invoice Nos. 32-018 and 32-019; (3) Bell's authority to sign county voucher forms indicating departmental approval; (4) Plaintiff's prior dealings in factoring invoices of Swerbeh and JTD at Provident; (5) the invoice verification forms, with their accompanying cautionary language; and (6) Plaintiff's customary practices and procedures.

However, the facts fall far short of proving Plaintiff's reliance was justifiable, even by a preponderance of the evidence, much less the applicable standard of proof by clear and convincing evidence. Plaintiff's purported reliance on Bell's representation, particularly when viewed in light of the facts of which Plaintiff had actual knowledge or might have discovered through the exercise of ordinary diligence, cannot be said to be justifiable.

Unlike the prior successful factoring transactions between Plaintiff and Defendant, no purchase order number was assigned for the invoices presented; and Plaintiff did not see a County 29A voucher form for these invoices.

There was no publication of any minutes of County Board meetings disclosing that the Defendant County Board authorized or executed a contract with respect to the invoices at issue,

although County Board approval, agendas, and minutes reflecting the approval of contracts and appropriations are matters of public record. Moreover, Plaintiff did not request a copy of the purported contract, failed to contact Defendant's Purchasing Agent or Comptroller, or consult any public records to determine whether the County Board had approved a contract for the invoices at issue.

Plaintiff's prior history in factoring Swerbeh and JTD accounts with Provident differed in several material respects from the factored invoices at issue here, which sought a far greater amount of money than the invoices Plaintiff previously factored. Prior invoices all fell well under the $10,000.00 County Ordinance limit.

The invoices at issue also involved many more employees than the invoices Plaintiff previously factored; and more employees were purportedly involved than a hospital of Provident's size could accommodate. Moreover, Plaintiff never received checks from Provident Hospital for its prior factoring transactions as purportedly anticipated here; instead, Plaintiff was only paid by Defendant, Cook County.

Plaintiff's prior factoring dealings differed regarding the invoices at issue in other material respects. Plaintiff customarily sought payment for Payne's Swerbeh invoices for a period covering one to two weeks; here, that period was three to four weeks. Plaintiff also failed to provide Bell with backup materials for Invoice Nos. 32-018 and 32-019, nor did Plaintiff confirm with Bell that he received backup materials from JTD for Invoice Nos. 32-018 and 32-019, as was customary. Instead, Plaintiff only sent Bell the invoice verification forms that listed the total amounts due and not the hours each individual employee worked. The invoices never

contained a purchase order number nor was a County 29A voucher form issued, as required and used on the past transactions.

Plaintiff obtained a Dun and Bradstreet report which clearly stated that Cook County, and not Provident itself, paid Provident's bills. Typically, Plaintiff obtained these reports before notifying the account debtor of the assignment of the client's account; but, here, Plaintiff obtained these reports after notifying Provident of the assignment of the account. A Dun and Bradstreet report on JTD indicated a federal tax lien had been placed on JTD. This report was obtained only after Plaintiff advanced significant funding to JTD for the invoices at issue. Previously, Plaintiff customarily requested a new client's tax returns when performing a due diligence investigation. Plaintiff did not obtain a Dun and Bradstreet report regarding Payne in connection with her JTD application until after funding had been advanced to JTD on Invoice No. 32-018. Customarily, this report was obtained during Plaintiff's due diligence process and not, as here, after Plaintiff had already advanced funds.

The social security number Payne listed on the forms she provided Plaintiff for her previous Swerbeh transactions differed from the social security number she listed on the forms she provided Plaintiff for her JTD transactions. Payne also signed her name as "Mary Hackney Payne" on the forms she provided Plaintiff for the Swerbeh transactions, but she signed her name as Mary A. Payne on the forms she provided Plaintiff for the JTD transactions.

Based on the above, Plaintiff's purported reliance on Bell's representations was far from justified; and Plaintiff failed to sustain its burden of proof in this regard. Plaintiff was required to exercise ordinary prudence to determine that a County obligation which supported Plaintiff's intended factoring actually existed. In this case, no such obligation existed. Based on the

18

County purchasing ordinance and the facts, the County cannot be held liable. Judgment is entered in favor of Defendant and against Plaintiff.

Dated: June 2, 2004

_____
JOHN W. DARRAH
United States District Judge